IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

SENTINEL INSURANCE COMPANY, :
LTD., and HARTFORD FIRE            :
INSURANCE COMPANY,                 :
                                   :
        Plaintiffs,                :
                                   :
v.                                 :
                                   :    No. 5:11-CV-488 (CAR)
ACTION STOP, LLC, BROADUS          :
WILLIAMS, and SHAWN SURLES,        :
                                   :
        Defendants,                :
                                   :
ACTION STOP, LLC,                  :
                                   :
        Third-Party Plaintiff,     :
                                   :
v.                                 :
                                   :
BB&T INSURANCE SERVICES, INC., :
                                   :
        Third-Party Defendant.     :
_____  :

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Before the Court are Plaintiffs Sentinel Insurance Company, Ltd. ("Sentinel") and

Hartford Fire Insurance Company's ("Hartford Fire") (collectively, "Plaintiffs" or

"Hartford") Motion for Summary Judgment [Doc. 37] and Supplemental Motion for

Summary Judgment [Doc. 45] as to Plaintiffs' request to rescind the insurance policies

issued to Defendant Action Stop LLC ("Action Stop") and Action Stop's breach of

contract and bad faith counterclaims.   Also pending before the Court is Third-Party Defendant BB&T Insurance Services, Inc.'s ("BB&T") Motion for Summary Judgment [Doc. 36] as to Third-Party Plaintiff Action Stop's breach of contract and bad faith claims.   Having considered the relevant facts, applicable law, and the parties' arguments, Plaintiffs' Motion for Summary Judgment [Doc. 37] and Supplemental Motion for Summary Judgment [Doc. 45] and Third-Party Defendant's Motion for Summary Judgment [Doc. 36] are **GRANTED**.

## LEGAL STANDARD

Summary judgment is proper if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1]   The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitles it to a judgment as a matter of law.[2]   If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[3]

---

[1] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[2] *Catrett*, 477 U.S. at 323 (internal quotation marks omitted).
[3] *See* Fed. R. Civ. P. 56(e); *see also Catrett*, 477 U.S. at 324-26.

The Court must view the facts, and any reasonable inferences drawn from those facts, in the light most favorable to the party opposing the motion.[4]  "The inferences, however, must be supported by the record, and a genuine dispute of material fact requires more than 'some metaphysical doubt as to the material facts.'"[5]  In cases where opposing parties tell different versions of the same events, and one is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."[6]  A disputed fact will preclude summary judgment only "if the dispute might affect the outcome of the suit under the governing law."[7]  "The court many not resolve any material factual dispute, but must deny the motion and proceed to trial if it finds that such an issue exists."[8]

A district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but must instead consider the merits of the motion.[9]  The district court need not *sua sponte* review all of the evidentiary materials on file at the time the motion is granted, but must ensure that the motion itself is supported by evidentiary materials and must review all of the evidentiary materials submitted in

---

[4] *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010); *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

[5] *Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) (quoting *Penley*, 605 F.3d at 848).

[6] *Pourmoghani-Esfahani v. Gee*, 625 F.2d 1313, 1315 (11th Cir. 2010) (per curiam) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

[7] *Id.* (internal quotation marks omitted).

[8] *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[9] *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004).

support of the motion for summary judgment.[10]   The district court's order granting

summary judgment must indicate that the merits of the motion were addressed.[11]

## BACKGROUND

The instant action to rescind insurance policies issued by Plaintiffs to Action Stop

arises out of Hartford's investigation of Action Stop's claims of loss revealing that

Action Stop offered sweepstakes games to its customers, a nature of business and

material risk that Hartford contends was not disclosed in Action Stop's application for

insurance.[12]   As a result, Hartford filed the instant action against Action Stop and Action

Stop employees Broadus Williams and Shawn Surles,[13] seeking to rescind Sentinel's

commercial general liability insurance policy and Hartford Fire's workers compensation

policy (the "Policies") on the grounds of a material misrepresentation.   Action Stop

subsequently filed a third-party Complaint against BB&T alleging that, in the event the

Court rescinded the Policies, BB&T is liable for failing to procure the requested

coverage.   At issue is whether Hartford is entitled to a judgment rescinding the

---

[10] *Id.* at 1101-02.

[11] *Id.* at 1102.

[12] *See* Booth Dep. Vol. I, 84 [Doc. 39].

[13] The record reflects that Williams and Surles were involved in a physical altercation in the parking lot of Action Stop on February 19, 2011, and that Surles sustained an injury as a result.  Am. Compl. ¶ 14 [Doc. 32 at 5]; Surles Answer ¶ 14 [Doc. 8 at 4].  According to Hartford's Complaint, Williams and Surles were named as Defendants so to bind them by the Court's determination of insurance coverage.  Am. Compl. ¶ 14 [Doc. 32 at 5]; Compl. ¶ 14 [Doc. 1 at 5].  Williams did not answer or otherwise respond to Hartford's Complaint, and on March 1, 2012, the Clerk of Court entered default as to Williams.  Entry of Default, Mar. 1, 2012.  Although Surles timely filed an Answer, he failed to otherwise respond to the pending summary judgment motions.  *See* Surles Answer [Doc. 8].  After careful scrutiny of the merits of the Motion and record, the Court finds there is nothing that would otherwise prevent the instant Order from binding Surles.  As default has been entered against Williams, this Order is also binding on Williams.

insurance policy, and, if so, whether BB&T is liable for failing to procure appropriate insurance for Action Stop.  The facts, in the light most favorable to Action Stop, the non-moving party, are as follows.

<u>Action Stop, LLC</u>

Action Stop was an internet café that sold prepaid telephone calling cards, cellular phone accessories, office products and services, and internet time on its on-site computer terminals.[14]  Most relevantly, Action Stop also offered "sweepstakes" games, whereby customers received sweepstakes entries, or points, proportionate to the number of phone card minutes they purchased.[15]  In addition to the 100 free sweepstakes entries each customer received every day, for every dollar of phone time a customer purchased on the phone card, he also received 100 additional points to "play" sweepstakes games on Action Stop's on-site computers.[16]  By playing sweepstakes, customers could win prizes such as a cruise vacation with Royal Caribbean or Estee Lauder makeup, more sweepstakes points, or up to $4,200.00 in cash.[17]

Action Stop's involvement with sweepstakes was neither happenstance nor a mere consequence of its operation as an internet café and phone card retailer.  Indeed, Booth was inspired by similar businesses in Florida whose "primary business" was

---

[14] Booth Dep. Vol. I, 33-42 [Doc. 39].
[15] *Id.* at 35-37.
[16] *Id.* at 35-37, 39; Booth Dep. Vol. II, 13, 84 [Doc. 43].
[17] Booth Dep. Vol. I, 40, 39 [Doc. 39].

sweepstakes.[18]  Booth described these businesses as follows:

> [I]t's an internet center, but they have–the primary business is a
> sweepstakes, and folks would come in; they would purchase their phone
> cards.  You know, a lot of the older folks … utilized [phone cards] to
> contact their loved ones and whatnot.  But they also knew that there were
> sweepstakes that were associated with [the phone cards], because that was
> the incentive that the vendor provided."[19]

It was under this business model that Booth opened Action Stop, heavily
promoting sweepstakes games by posting signs in its windows advertising, "Daily
Promotional Sweepstakes!!," "35 Exciting Games!!!," and "Cash Prizes!!"[20]  Christina
Booth, Action Stop's Rule 30(b)(6) Corporate Representative, initially testified that
sweepstakes accounted for approximately 70% of Action Stop's revenue, but later
clarified that the bulk of its revenue was generated from phone card sales, not
necessarily sweepstakes games.[21]

Insurance

On June 2, 2010, Booth leased a storefront at a Macon, Georgia shopping center
from which to operate Action Stop.[22]  Because her lease agreement required that she
obtain commercial liability insurance for Action Stop, Booth contacted BB&T that day
and requested assistance in obtaining insurance quotes.[23]  BB&T is an independent
insurance agency that places clients with suitable insurance companies and policies

---

[18] *Id.* at 29-34.
[19] *Id.* at 34-35.
[20] Booth Dep. Ex. 16 [Doc. 43-1 at 35].
[21] *Id.* at 42 [Doc. 39]; Booth Dep. Vol. II, 17 [Doc. 43].
[22] Booth Dep. Vol. II, 27 [Doc. 43].
[23] Jones Aff. ¶¶ 2, 4 [Doc. 36-7]; Booth Dep. Vol. I, 84-85 [Doc. 39].

based on its contracts with "hundreds of insurance companies."[24]   In this capacity,
BB&T does not work for an insurance company nor does it have authority to bind
coverage or issue policies on behalf of Hartford Fire or Sentinel.[25]

Later that day, Arthur Jones, an insurance salesman for BB&T, returned Booth's
call and inquired about the nature of Action Stop's business and the type of insurance
she desired.[26]   Booth informed Jones that she needed commercial insurance as well as
workers compensation insurance and described Action Stop as an internet café that sold
phone accessory products and offered free soft drinks and snacks to its customers.[27]
Based on this conversation, Jones determined that Action Stop was looking for a
business owner's policy, a workers compensation policy, and property and liability
coverage, concluding that Hartford would be the "best product with the best cost [and]
best premium for [Action Stop]."[28]   That afternoon, Jones submitted Action Stop's
information to Hartford, requesting a commercial general liability policy from Sentinel
and a workers compensation policy from Hartford Fire.[29]

Jennifer Vaughns-Liddle, an underwriting assistant for Hartford who processes
Hartford's insurance applications, reviewed Jones's initial submission and "flagged" it
for additional inquiry because of Action Stop's stated intention to operate an internet

---

[24] Jones Dep. 54-55 [Doc. 40].
[25] *Id.* at 55.
[26] Jones Aff. ¶ 11 [Doc. 36-7]; Jones Dep. 15 [Doc. 40]; Booth Dep. Vol. I, 86 [Doc. 39].
[27] Booth Dep. Vol. I, 86-87 [Doc. 39].
[28] Jones Dep. 26, 27 [Doc. 40].
[29] Jones Aff. ¶ 11 [Doc. 36-7].

café.[30]  In a February of 2010 internal memorandum, Hartford warned its underwriters of the risks associated with internet cafés offering sweepstakes and instructed them to make certain inquiries of those businesses describing themselves as an internet café.[31] In relevant part, the memorandum stated the following:

> A recent development associated with internet cafés has been the introduction of sweepstakes gaming.  The cafés sell customers phone cards or internet time that allows them to play sweepstakes games— mostly slot and card games.  Customers can win prizes, more playing time or cash.
>
> …
>
> We're only aware of sweepstakes gaming in internet cafés surfacing in a small number of states thus far … but it's expected to continue to rapidly expand due to the high profit margins.  Gambling is illegal in most states, but these operations are finding loopholes in the laws that allow them to operate.
>
> …
>
> Besides the obvious concern regarding insuring an illegal business, <u>there are other insurance concerns associated with these sweepstakes from the potential crime exposure presented by large sums of cash</u> to the liability associated operating late into the night.
>
> …
>
> <u>Our position is to avoid insuring internet cafés … with known sweepstakes or gambling operations.</u>  The existence of an internet café … can usually be determined by the name, but whether the sweepstakes exposure exists is not usually obvious.[32]

---

[30] Vaughns-Liddle Decl. ¶ 2 [Doc. 37-3].
[31] *Id.* at ¶ 3.
[32] Vaughns-Liddle Decl. Ex. 2 [Doc. 37-3] (emphasis added).

Based on the memorandum, Vaughns-Liddle replied to Jones's submission with several questions about Action Stop's business, including: "Does the insured offer any type of sweepstakes, gambling, or arcade games[?]"[33]

Jones promptly called Booth regarding Vaughn-Liddle's concerns.[34]   What specifically Jones asked Booth, and what, if anything Booth answered, is disputed. However, reading the facts in the light most favorable to Action Stop, the Court considers only Action Stop's version of events.  According to Booth, Jones asked her about arcade games, but did <u>not</u> ask about sweepstakes or gambling.[35]  Although Booth admitted that she was driving and consequently could only remember "bits and pieces" of the conversation, she unequivocally testified that the word "sweepstakes" was never mentioned in their phone call.[36]  In sum, "sweepstakes" was never mentioned in any portion of Action Stop's communication with BB&T.

The next morning, Jones responded to Vaughns-Liddle's inquiries and stated that "there was no gambling or sweepstakes or arcade games" at Action Stop.[37]  Jones additionally requested that Hartford issue policies effective that day.[38]  On June 3, 2010, Sentinel issued a commercial general liability policy and Hartford Fire issued a workers' compensation liability policy for one year, both of which were renewed in

---

[33] Vaughns-Liddle Decl. ¶ 4, Ex. 3 [Doc. 37-3].
[34] Jones Dep. 33 [Doc. 40].
[35] Booth Dep. Vol. II, 32 [Doc. 43].
[36] Booth Dep. Vol. I, 99-104, 95 [Doc. 39]; Booth Dep. Vol. II, 26 [Doc. 43].
[37] Vaughns-Liddle Decl.¶ 5, Ex. 3 [Doc. 37-3].
[38] *Id.*

June of 2011 for an additional year.[39]

<u>Burglaries and Plaintiffs' Investigation</u>

Between December of 2010 and July of 2011, Action Stop was burglarized four separate times, the latter two of which took place on June 23, 2011, and July 4, 2011.[40] Booth closed Action Stop shortly after the July 4th burglary.[41]   Booth subsequently submitted claims for property damage and other losses under the Policies resulting from the summer burglaries which promoted Hartford's investigation.[42]

While investigating Action Stop's claims, Hartford discovered that Action Stop participated in sweepstakes games.[43]   In her deposition, Vaughns-Liddle testified that "[h]ad Action Stop indicated that it would be operating an internet café that offered sweepstakes games, then the[   P]olicies would not have been issued pursuant to Hartford's underwriting guidelines and procedures."[44]   In September of 2011, Sentinel and Hartford Fire both sent letters cancelling their Policies to Action Stop effective October 17, 2011, and December 1, 2011, respectively.[45]

On December 13, 2011, Hartford filed the instant action against Action Stop, Williams, and Surles, seeking to rescind the Policy on the grounds of a material misrepresentation.   Subsequently, the Court permitted Action Stop to amend their

[39] Compl. Exs. B, C, D, & E [Docs. 1-10].
[40] Booth Dep. Vol. II, 63 [Doc. 43].
[41] Police Report I [Doc. 36-3 at 16]; Police Report II [Doc. 36-3 at 16, 21]; Booth Dep. 63 [Doc. 43].
[42] Booth Dep. Vol. II, 62, 76 [Doc. 43].
[43] Booth Dep. Vol. II, Ex. 16 [Doc. 43-1 at 37].
[44] Vaughns-Liddle Decl. ¶ 6 [Doc. 37-3].
[45] Cancellation Letters [Docs. 1-11, 1-12].

answer and assert breach of contract and bad faith counterclaims against Hartford and join BB&T as a third-party Defendant for its alleged failure to procure the requested insurance.[46]

Hartford and BB&T moved for summary judgment on March 15, 2013, and on March 18, 2013, Hartford timely filed a supplemental motion.  Action Stop responded to Hartford's and BB&T's Motions; Plaintiffs and BB&T have since filed their replies.  Accordingly, the Motions are now ripe for this Court's review.

## DISCUSSION

As a preliminary matter, Local Rule 56 requires the movant for summary judgment to include with the motion and memorandum of law a separate, concise, numbered statement of the material facts as to which it contends there is no genuine issue to be tried, and requires the non-movant to respond to the statement of material facts by objecting to, admitting, or specifically refuting each fact.[47]  Pursuant to this Rule, a non-movant's failure to refute the statement of material facts in this manner will result in the Court's deeming each of the movant's facts admitted, "unless otherwise inappropriate."[48]

Here, in responding to the Motions for Summary Judgment, Action Stop failed to respond to Hartford's and BB&T's statements of undisputed material facts, instead

---

[46] Order [Doc. 23].
[47] M.D. Ga. L.R. 56.
[48] *Id.*

filing its own separate statement of material disputed facts.  In their Reply Briefs, movants argue that their statements of facts should be deemed admitted because Action Stop failed to comply with Local Rule 56.

Local Rule 56 is intended to instruct the parties on how best to assist the Court in identifying genuine material facts which are in dispute.  After all, "[j]udges are not like pigs, hunting for truffles buried in briefs."[49]  In the Eleventh Circuit, local rules are binding on the parties, but the enforcement of these rules must be tempered with consideration of the circumstances.  Here, the Court finds that the materials presented by the parties provide a sufficiently developed record for the adjudication of the pending Motions, especially when considering that facts and reasonable inferences must be construed in favor of the non-moving party.  The Court thus considers the merits of the pending summary judgment motions.

## I.   Hartford's Motions for Summary Judgment

It is undisputed that the Policies at issue recognize burglary as a valid claim of loss.  In its Motions, Hartford seeks to (1) rescind the Policies based on Action Stop's alleged misrepresentations, and (2) dismiss Action Stop's bad faith counterclaim for failure to pay under the Policies.  The Court first considers whether Hartford is entitled to rescind the Policies as a matter of law.

### A.   Rescission

---

[49] *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (cited by *Smith v. Sec., Dep't of Corrs.*, 572 F.3d 1327, 1352 (11th Cir. 2009)).

Under Georgia law,

> Misrepresentations, incorrect statements, or omissions of fact on an insurance application do not prevent recovery under the policy unless (1) fraudulent; (2) material either to acceptance of the risk or the hazard assumed; or (3) the insurer in good faith would not have issued the policy if the true facts had been known to the insurer.[50]

To void an insurance policy under O.C.G.A. § 33-24-7(b), the insurer must show (1) the existence of a misrepresentation, omission, concealment of facts, or incorrect fact made by or on behalf of an insured, and (2) the materiality of such facts, omissions, or misrepresentation.[51]  The Court considers both of these elements separately.

    1.  *Existence of the Misrepresentation*

Hartford contends that Action Stop misrepresented the nature of its business by informing Hartford that it did not participate in sweepstakes games.  Thus, the Court's inquiry is two-fold.  First, the Court must consider whether, as a matter of law, BB&T acted as Action Stop's agent such that BB&T's statements to Hartford may be attributed to Action Stop as its principal.  If BB&T was Action Stop's agent, the Court must next determine whether, as a matter of law, BB&T, on behalf of Action Stop, misrepresented the nature of the business when applying for insurance.

With respect to the first inquiry, the Court concludes that the uncontroverted record demonstrates BB&T acted as Agent Stop's agent.  It is undisputed that BB&T was an independent insurance agent and "[i]ndependent agents or brokers are generally

---

[50] *Taylor v. Ga. Int'l Life Ins. Co.*, 207 Ga. App. 341, 342 (1993) (citing OCGA § 33–24–7(b)).
[51] *See* O.C.G.A. § 33-24-7(a), (b); *see also Oakes v. Blue Cross/Blue Shield*, 170 Ga. App. 335, 336 (1984).

considered the agent of the insured, not the insurer."[52]  Booth recognized BB&T as her

agent in procuring insurance coverage and relied on Jones's judgment and discretion in

this capacity.[53]  The record also reflects that BB&T determined the nature of Action

Stop's business, evaluated Booth's requests for insurance coverage, and made a

coverage recommendation that he promptly obtained Booth's behalf through Hartford's

underwriter.

To the extent Action Stop argues that BB&T is Hartford's agent, this argument is

unsupported by the record.  The Court can find no evidence nor has Action Stop

pointed to any, that suggests BB&T was Hartford's agent.[54]  Importantly, BB&T does not

work for an insurance company nor does it have authority to bind coverage or issue

policies on behalf of Hartford Fire or Sentinel.[55]  Consequently, the Court concludes that

BB&T did not act as Hartford's agent, but Action Stop's agent, and any statements

made to Hartford by BB&T can be attributed to Action Stop as a matter of law.

With respect to the second determination, whether Action Stop misrepresented

the nature of its business by informing Hartford that it did not offer sweepstakes,

---

[52] *Kirby v. NW Nat. Cas. Co.*, 213 Ga. App. 673, 678 (1994).

[53] Booth Dep. Vol. I, 84 [Doc. 39]; Jones Dep. 54 [Doc. 40].  Hartford contends that Action Stop admitted BB&T was its agent in its third-party complaint and thus that Action Stop is bound by its judicial admission.  Although a party is generally bound by its judicial admissions, *see Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, (11th Cir. 1983), an exception exists to permit a party to exercise liberal pleading and joinder provisions.  *Nichols v. Barwick*, 792 F.2d 1520, 1523 (11th Cir. 1986). Here, the record reflects that Action Stop took inconsistent positions so as to create a basis for establishing the contingent liability of BB&T.  In this respect, Hartford's argument is without merit.

[54] *See European Bakers, Ltd. v. Holman*, 117 Ga. App. 172, 174 (1985) (concluding that uncontroverted evidence "demanded the conclusion" that insurance broker acted as agent to appellant).

[55] Jones Dep. 55 [Doc. 40].

Hartford must demonstrate the existence of objectively false information.   "[T]he Supreme Court of Georgia has specifically eschewed any need for the insurer to show that the [insured] was aware of the falsity of the representation or statement in order to void a policy under subsections (2) or (3) [of O.C.G.A. § 33-24-7]."[56]   Additionally, it is immaterial whether Action Stop acted in good faith in completing the application.[57]

Here, it is undisputed that the information submitted by Action Stop about its business explicitly denounced any involvement with sweepstakes games.[58]   It is also undisputed that, contrary to this representation, Action Stop did in fact offer sweepstakes games.   The record reveals that sweepstakes was Action Stop's primary business and that the revenue generated by phone cards and promotional sweepstakes amounted to nearly three-quarters of Action Stop's total revenue.[59]   Moreover, it is apparent that Booth intended to offer sweepstakes to its customers from its inception. Although Booth testified that she would not have lied about this information if requested, the insured's good faith intentions are irrelevant.   Consequently, reading the facts in the light most favorable to Action Stop, the Court finds that Action Stop misrepresented the nature of its business in its insurance application to Hartford.

2.   _Materiality of the Misrepresentation_

---

[56] _White v. Am. Family Life Assurance Co._, 284 Ga. App. 58, 61 (2007).
[57] _Davis v. John Hancock Mut. Life Ins._, 202 Ga. App. 3, 5 (1991).
[58] Vaughns-Liddle Decl. ¶ 5, Ex. 3 [Doc. 37-3].
[59] Booth Dep. Vol. I, 42 [Doc. 39]; Booth Dep. Vol. II, 35-37 [Doc. 40].

Action Stop next argues that even if it did misrepresent the nature of its business, the misrepresentation was immaterial.   Hartford counters with Vaughns-Liddle's testimony that Hartford would not have insured Action Stop had it known that Action Stop participated in sweepstakes games.

Under O.C.G.A. § 33-24-7(b)(3), an insurer may rescind a policy if it shows that it would not have issued a policy under its underwriting guidelines had the true facts been disclosed.[60]   An insurer must prove that the statement was material because it changed "the nature, extent, or character of the risk."[61]  "A material misrepresentation is one that would influence a prudent insurer in deciding whether to assume the risk of providing coverage."[62]    "Ordinarily it is a jury question as to whether a misrepresentation is material, but where the evidence excludes every reasonable inference except that it was material, it is a question of law for the court."[63]

Here, the undisputed evidence demonstrates that Vaughns-Liddle flagged Action Stop's initial submission for additional inquiry because of an internal memorandum circulated four months earlier.   In addition to describing the risks associated with offering sweepstakes, the memorandum stated: "Our position is to avoid insuring internet cafés or cybercafés with known sweepstakes or gambling

---

[60] O.C.G.A. § 33-24-7(b)(3).

[61] *Nappier v. Allstate Ins. Co.*, 961 F.2d 168, 168 (11th Cir. 1992).

[62] *Id.* at 170 (citing *Haugseth v. Cotton States Mut. Ins. Co.*, 192 Ga. App. 853, 854 (1989)).

[63] *Miller v. Nationwide Ins.*, 202 Ga. App. 737, 738 (1992).

operations."[64]   Vaughns-Liddle specifically requested that Jones make additional inquiries of Action Stop and, only after learning, in part, that Action Stop did not offer sweepstakes, did Hartford issue the Policies.   Importantly, Vaughns-Liddle testified that had Action Stop revealed that it offered sweepstakes games to its customers in its application, "then [the Policies] would not have been issued pursuant to Hartford's underwriting guidelines and procedures."[65]   Although the materiality of a misrepresentation is usually reserved for a jury, Action Stop has not produced any evidence contradicting Vaughns-Liddle's testimony.[66]   Thus, because the uncontroverted evidence conclusively establishes that Hartford would not have issued the Policies under its underwriting guidelines if it known that Action Stop participated in sweepstakes games, the Court finds that, as a matter of law, the failure to disclose the true nature of Action Stop's business was material to the acceptance of the risk.

Based on the foregoing, the Court finds that, as a matter of law, Action Stop made a material misrepresentation in applying for insurance and thus that the Policies are due to be rescinded.   Accordingly, Hartford's Motion for Summary Judgment is **GRANTED**.   Because the Policies are rescinded as a matter of law, there exists no

---

[64] Vaughns-Liddle Decl. Ex. 2 [Doc. 37-3].
[65] Vaughns-Liddle Decl. ¶ 16 [Doc. 37-3].
[66] *See Miller*, 202 Ga. App. at 782.

contract under which Action Stop can pursue its breach of contract counterclaim; this claim is also therefore dismissed.[67]

### B. Bad Faith Counterclaim

Likewise, with respect to Action Stop's bad faith counterclaim against Hartford, the Court finds that this claim cannot survive summary judgment.   Action Stop's material misrepresentation in its insurance application constituted a reasonable ground for Hartford to contest the claims.   Although determinations of bad faith are ordinarily reserved for the jury,[68] a bad faith claim fails as a matter of law if the insurer has "any reasonable ground to contest the claim."[69]   Accordingly, Hartford's Supplemental Motion seeking summary judgment as to Action Stop's bad faith counterclaim is **GRANTED**.

### C.  BB&T's Motion for Summary Judgment

Because Hartford's Policies are rescinded as a matter of law, the Court next considers BB&T's Motion for Summary Judgment as to Action Stop's negligent procurement claim.   In its Third-Party Complaint, Action Stop alleges that BB&T is liable for its negligence in failing to procure the requested insurance.

---

[67] *Jones v. Valley Forge Ins. Co.*, 191 Ga. App. 591, 591 (1989); *see Dracz v. Am. Gen. Life Ins. Co.*, 427 F. Supp. 2d 1165, 1170 (M.D. Ga. 2006).

[68] *Stegall v. Guardian Life Ins. Co. of Am.*, 171 Ga. App. 576, 577 (1984).

[69] *Grange Mut. Cas. Co. v. Law*, 223 Ga. App. 748, 750 (1996).

Pursuant to Georgia law, the requisite elements of a negligence cause of action are duty, breach of duty, causation, and damages.[70]   When an insurance agent negligently fails to procure requested insurance, he steps into the shoes of the insurer and becomes "liable for loss or damage to the limit of the agreed policy."[71]   Georgia courts have consistently reiterated that the agent must have failed to procure the <u>requested</u> insurance to be liable for negligent procurement.[72]

Although Action Stop contends that BB&T "owed Action Stop, LLC a duty to PROVIDE THE INSURANCE REQUESTED," Action Stop fails to point to any evidence that Action Stop requested insurance for its sweepstakes business or even that Action Stop disclosed its participation in sweepstakes to BB&T, despite the fact that sweepstakes was the cornerstone of Action Stop's business.[73]   Even when reading the facts in the light most favorable to Action Stop, Booth never discussed the sweepstakes portion of her business with Jones nor did she request sweepstakes coverage.   The Court therefore finds that BB&T did not have a duty to procure insurance for a sweepstakes business, and because the insurance that BB&T procured does not vary

---

[70] *Johnson v. Am. Nat'l Red Cross*, 276 Ga. 270, 272 (2003); *see Four Seasons Healthcare, Inc. v. Willis Ins. Servs. of Ga. Inc.*, 299 Ga. App. 183, 186 (2009) (recognizing negligent procurement to be a negligence cause of action).

[71] *Ga. Farm Bureau Mut. Ins. Co. v. Arnold*, 175 Ga. App. 850, 852 (1985).

[72] *See, e.g., Moseley v. Coastal Plains Gin Co., Inc.*, 199 Ga. App. 99, 100 (1991) ("Where one undertakes to procure insurance for another and is guilty of negligence in his undertaking, he is liable for loss or damage to the limit of the agreed policy.").

[73] Resp. Br. [Doc. 50 at 9] (emphasis in original).

from the insurance that Action Stop requested, BB&T did not, as a matter of law, breach its duty to procure the requested insurance.

Even assuming, however, that Action Stop did request sweepstakes coverage, Action Stop nevertheless cannot prove the causation element of its claim.  "Under Georgia law…the alleged wrongdoing of an insurance agent is not the proximate cause of the insured's denial of coverage unless coverage would have been available but for the agent's wrongdoing."[74]  Here, Action Stop has failed to produce any evidence sufficient to support a finding that coverage for sweepstakes gaming would have been available from other insurance company.  As a result, Action Stop's negligence claim fails as a matter of law.

To the extent Action Stop contends that BB&T also breached its duty by failing to accurately portray Action Stop's business to Hartford, this theory cannot withstand summary judgment.  As discussed Action Stop has failed to demonstrate how BB&T's actions caused the alleged loss to Action Stop.

Based on the foregoing, Action Stop's negligent procurement claim against BB&T cannot defeat summary judgment, and BB&T's Motion for Summary Judgment with respect to this claim is **GRANTED**.

---

[74] *Merritt v. Hub Int'l SW Agency Ltd.*, 466 F. App'x 779, 780 (11th Cir. 2012) (citing *Conner Ins. Agency, Inc. v. Strauch*, 198 Ga. App. 536, 536 (1991) & *Peagler & Manley Ins. Agency, Inc. v. Studebaker*, 156 Ga. App. 786, 786 (1980)).

Finally, the Court concludes that Action Stop's bad faith claim against BB&T must also be dismissed.  Under O.C.G.A. § 13-6-11, a plaintiff may recover the expenses of litigation if "the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense[.]"  Here, despite BB&T's explicit request for summary judgment of this claim, Action Stop fails to offer any response and consequently abandons its bad faith claim against BB&T.[75]  Moreover, Action Stop did not produce any evidence to indicate that BB&T acted in bad faith.[76]  Summary judgment with respect to Action Stop's bad faith claim is **GRANTED**.

## CONCLUSION

In sum, Hartford's Motion for Summary Judgment [Doc. 37] and Supplemental Motion for Summary Judgment [Doc. 45] and BB&T's Motion for Summary Judgment [Doc. 36] are **GRANTED**.  This action is hereby **DISMISSED** in its entirety.


**SO ORDERED,** this 23rd day of July, 2013.

S/  C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

LMH/bbp

---

[75] *See Wilkerson v. Grinnel Corp.,* 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned where plaintiff did not address claim on summary judgment); *Wu v. SE–Atl. Bev. Corp.,* 321 F. Supp. 2d 1317, 1333 (N.D. Ga. 2004) (finding claim abandoned where plaintiff failed to address claim in response to a motion for summary judgment).

[76] *See Memar v. Jebraeilli,* 303 Ga. App. 557, 563 (2010) ("[I]n the absence of bad faith, an award pursuant to O.C.G.A. § 13-6-11 is not authorized if a bona fide controversy clearly exists between the parties.").